**ANDREW CORPORATION, a. corporation, Plaintiff,**

v.

**CABLEWAVE SYSTEMS, INC., a corporation, and Kabel-und Metallwerke Gutehoffnungshuette AG, a joint stock company, Defendants.**

Civ. No. N–74–124.

United States District Court,
D. Connecticut.

Feb. 21, 1978.

Robert C. Oliver, Daggett, Colby & Hooker, New Haven, Conn., Phillip H. Mayer, Stephen C. Rudisill, Leydig, Voit, Osann & Mayer, Chicago, Ill., for plaintiff.

Roland T. Bryan, Bryan & Bollo, Stamford, Conn., James C. Jangarathis, Marn & Jangarathis, Englewood Cliffs, N. J., for defendants Cablewave Systems, Inc. and Kabel-und Metallwerke Gutehoffnungshuette AG.

RULING ON DEFENDANTS' "ON SALE" DEFENSE

ZAMPANO, District Judge.

In this action based on a claim of patent infringement, the plaintiff Andrew Corpo-

ration ("Andrew") seeks injunctive and monetary relief against Cablewave Systems, Inc. ("Cablewave") and Kabel-und Metallwerke Gutehoffnungshuette AG ("KM"). Jurisdiction is invoked pursuant to 28 U.S.C. § 1338(a) and 35 U.S.C. § 281.

The defendants contend, among other defenses, that the patent in question was invalid because the invention was "on sale," within the meaning of 35 U.S.C. § 102(b), for a period of more than one year prior to the date of the patent application. Accordingly, the Court ordered a separate trial with respect to the "on sale" issue pursuant to Rule 42(b), Fed.R.Civ.P. Following a two-day trial, the parties filed comprehensive briefs and the matter is now ripe for decision.

I

For many years, Andrew has been a manufacturer of radio frequency cables and antennas. Since 1954 one of its principal sources of business has been the Motorola Company, the country's leading supplier of two-way radios. Motorola advertised and sold a complete radio communications system and, upon receipt of an order, it would send the radio directly to the purchaser and notify Andrew to "drop ship" the antenna subsystem and a transmission line kit to that purchaser. The Andrew's kit included a corrugated dielectric cable, end fittings, and equipment to attach the cable to a transmission tower. Although no sales contract existed between the two companies, Andrew would bill Motorola for the "drop ships" at regular intervals.

In 1961 Motorola found that sales were decreasing due to a two-way radio communications system being marketed by the General Electric Company. The GE equipment was being offered for sale at a lower price than Motorola's and the management of Motorola reached a tentative decision to cut production costs by manufacturing their own antenna cable kits. It was determined that Motorola could produce a cheaper cable using Phelps Dodge Foamflex which primarily consisted of an aluminum rather than the copper outer conductor utilized by

Andrew. In April 1961 Motorola informed Andrew of their decision to supply customers with Motorola cable kits.

Thereupon Mr. Robert P. Lamons, vice president and sales manager of Andrew, commenced a campaign to retain the Motorola account. He implored the Motorola officials to give Andrew an opportunity to develop a high quality but inexpensive copper cable kit. After repeated discussions, Motorola in June decided to place their in-house cable production plans on "hold" so that, as Mr. Lamons testified, Andrew would have "a chance to develop this cable we were dreaming and talking about." (Tr. 292). A target date of September 1, 1961 was agreed upon. On June 20, 1961, Lamons circulated an internal "victory" memorandum (DX–Y) among the employees at Andrew:

"Q. What did you intend to convey to the recipients of that memo?

A. Well, job well done in coming up with enough backup information that I could convince Motorola we could develop a cable with marketing appeal for them. And let's get on with the job. Now we've got to develop the cable, exhorting this team that had put so much into checking the feasibility of welding thin walls, checking all other elements of my presentation to Motorola and giving me technical backup and exhorting them to the effort they'd have to make to develop the cable."

(Tr. 293).

During the summer of 1961 Lamons and his engineers worked feverishly to develop the new foam dielectric cable. An outside source, Pyramid Plastics, Inc., was called upon to aid in the process. A considerable amount of effort was devoted to the mechanical problems of encasing the "cable core" produced by Pyramid in a corrugated outer conductor and developing lower cost connectors for the new cable. One critical property of the new cable concerned "attenuation" or the "loss of efficiency" in "carrying energy from one place to another." (Tr. 199). Throughout these early stages of development Andrew technicians calculated

but did not actually test the attenuation characteristics of the new foam dielectric cable. While one isolated test demonstrated satisfactory levels of attenuation prior to August, subsequent and more reliable testing revealed that the *measured* attenuation data was unsatisfactory when compared to the calculated data. In order to keep Motorola "in the fold," Andrew did not notify Motorola of this crisis.

The serious impact of the attenuation deficiency was vividly described in the testimony of Mr. John S. Brown, Andrew's engineering projects manager, as follows:

"Q. I'd like to direct your attention, Mr. Brown—final question here to this Labor Day period in 1961, and ask whether or not you recall in or about this time some sort of peak or crisis in the cable development and what is your recollection of what occurred?

A. I certainly do. It was a disaster.

Q. What happened?

A. Oh, sometime in—I suppose it was around the middle of August we discovered a—we weren't able to produce foam cables with the calculated attenuation that we hoped to achieve. We measured a number of different lengths of cable and we found wide variations in attenuation. Sometimes we'd get a piece that was as good as the calculation. Sometimes we'd get a piece in which the attenuation was two or three times worse, which is to say, you don't have anything you can sell anybody because you sell—one of the parameters you sell, particularly in the two-way radio market, which we were pointing this product towards, as well as other markets, was attenuation. The choice of cable size was generally not made in the basis of power handling capacity, but on the basis of attenuation, the height of the tower, the area they were trying to cover with their two-way radio system dictated certain mechanical values of loss in all parts of the system, one of which was the coaxial cable, and we couldn't sell a cable that had three times as much loss as we advertised. Just wasn't a viable product, and what's

doing it? What's causing it? We didn't know what was causing it. At that time."

(Tr. 212–213).

Accordingly, Andrew engineers directed their efforts to overcoming the attenuation problem. They theorized that the excessive attenuation might be caused by moisture picked up by the foam dielectric core in the cooling troughs or from the chemical flowing agent used to make the foam. On the Labor Day weekend, September 2–4, several reels of core made by Pyramid were sent out to another contractor for oven drying. The oven drying procedure solved the moisture problem. An Engineering Change Notice (PX–71) was issued by Andrew on September 8:

Added note four, drying of cable core. The reason for change, foam core as extended has high dissipation factor, material must be dried before cable manufacturing to produce satisfactory cable.

The following week, September 11–15, Andrew made its first production run of the new cable for delivery to a Motorola customer.

In February 1962 Andrew's patent management committee in consultation with their patent attorney determined that September 14, 1962 was the deadline for the filing of a patent application with respect to the new cable. The application was filed on August 27, 1962 and on March 16, 1965, United States Patent No. 3,173,990 was issued to Andrew as assignee of Mr. Lamons for "Foam-Dielectric Coaxial Cable With Temperature-Independent Relative Conductor Length" ("Lamons '990").

II

The defendants contend that the Lamons '990 patent is invalid on the ground that the invention was "on sale" more than a year prior to August 27, 1962, the filing date of the application which resulted in the issuance of the patent.

■ Section 102(b) of Title 35 provides: A person shall be entitled to a patent unless—

(b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

The policy consideration underlying the rule is to prevent the extension of the period of monopoly permitted under the patent laws by requiring the inventor to make a timely application so that the patent period will commence to run without undue delay. *Cataphote Corporation v. DeSoto Chemical Coatings, Inc.*, 356 F.2d 24, 25 (9 Cir.), cert. denied, 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966); see also *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516, 520 (2 Cir.), cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946).

In *Timely Products Corporation v. Arron*, 523 F.2d 288, 302 (2 Cir. 1975), the Second Circuit concluded that the solicitation of an order for a specific article to be produced later can place that article "on sale" within the meaning of Section 102(b), but only when the following requisites are also present:

(1) The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale. . . . Complete readability of the claim on the thing offered is not required because whatever is published (or on sale) more than one year prior to the filing of a patent application becomes part of the prior art over which the claim must be patentable. [citations omitted].

(2) The invention must have been tested sufficiently to verify that it is operable and commercially marketable. This is simply another way of expressing the principle that an invention cannot be offered for sale until it is completed, which requires not merely its conception but its reduction to practice. [citations omitted].

(3) Finally, the sale must be primarily for profit rather than for experimental purposes. [citations omitted].

There is a serious question whether the defendants established requirement (1) at trial. In any event, with respect to requisite (2), the evidence was clear that prior to the critical date Lamons '990 had not been tested sufficiently to verify that it was operable and commercially marketable. After the mental conceptualization of the invention by Mr. Lamons in the spring of 1961, he determined that September 1, 1961 was the target date to complete the invention for future sales to Motorola's customers. The Court finds that all activities of Andrew's engineers with respect to the invention until that date were solely experimental and not commercial in nature. Cf. *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 404 F.Supp. 1295, 1297 (N.D.Miss.1975); *Systematic Tool & Machine Co. v. Walter Kidde & Co., Inc.*, 390 F.Supp. 178, 194–195 (E.D.Pa.1975), rev'd on other grounds, 555 F.2d 342 (3 Cir. 1977).

Moreover, when the moisture problem in the foam dielectric cable was uncovered by the tests in late August, it was evident that no working prototype in final form was in existence. The Court is satisfied that at that time Andrew's engineers were uncertain of their ability to produce an operable cable and that the invention had not reached the degree of reality to enable it to be offered to Motorola for public use and sale. Until the attenuation problem was solved on the Labor Day weekend, the cable had not been successfully reduced to practice and was not effectively operational for its intended purpose. Cf. *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 280–285, (5 Cir.), cert. denied, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974); *Hobbs v. U. S. Atomic Energy Commission*, 451 F.2d 849, 859 (5 Cir. 1971).

Defendants rely heavily on a memorandum from Andrew to KM (DX–M) to support their contention that the invention had been reduced to practice prior to August 27, 1961. In this report Andrew, on or about July 20, 1961, advised that the electrical loss in one size cable was satisfactory when compared to the competing Foamflex product. However, it appears that the lone sample referred to in DX–M had satisfactory attenuation because it accidentally dried out while not being used in the factory over an extended period of time. As Mr. Johnson explained:

We had one case in the half inch size where we came out with a good attenuation curve, and that's reported in Dick Bremigan's memo, and this was a core that apparently was allowed to sit around in the laboratory and wait for several weeks until we're able to sheath it, and we believe that this core dried by itself while sitting in an air-conditioned laboratory waiting to be sheathed. We were never able to reproduce that. We never made a ⅞ inch cable of good attenuation of any kind until after the Labor Day weekend. (Tr. 272–273).

Thus, while the DX–M report suggested a successful intermediate test, the Court is convinced that the test failed to demonstrate that the new cables possessed the utility required for a reduction to practice. Cf. *Bell Tel. Laboratories v. Hughes Aircraft Co.*, 422 F.Supp. 372, 380 (D.Del.1976).

██ Under these circumstances, it is the opinion of the Court that Lamons '990 was not in public use or on sale, within the meaning of 35 U.S.C. § 102(b), more than one year prior to the filing date of the original patent application pursuant to which the patent was granted.